Filed 8/16/16  P. v. Liu CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B266352 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA103107) |
| v. | |
| KEVIN LIU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. George Genesta, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney, defendant and appellant Kevin Liu was charged with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664/187, subd. (a); counts 1 & 2);[1] assault with a firearm (§ 245, subd. (a)(2); counts 3 & 4); possession of a silencer (§ 33410; count 5); first degree residential burglary (§ 459; count 6); and criminal threats (§ 422, subd. (a); counts 7 & 8). It was further alleged that defendant personally used a firearm as to counts 1 and 2 (§ 12022.53, subds. (b) & (c)) and as to counts 3, 4, 6, 7, and 8 (§ 12022.5, subd. (a)).

Following trial, the jury found defendant guilty of the attempted murder of Martin Sandoval (Sandoval) on count 2 and the willful and deliberate allegation was found not true. The jury also found as to count 2 that defendant personally used a firearm (§ 12022.53, subd. (b)), but found the section 12022.53, subdivision (c), allegation not true. Finally, the jury found defendant guilty on counts 3, 4, 5, and 8, and found the firearm allegations true. It found defendant not guilty on counts 1, 6, and 7.

The trial court sentenced defendant to a total term of 20 years in state prison.

Defendant timely appeals. He assigns the following errors: (1) The trial court erred in refusing a heat of passion instruction; (2) The trial court should have allowed the defense psychiatric expert to testify about defendant's mental condition; (3) The trial court improperly excluded testimony that Sandoval had been accused of molesting defendant's daughter; and (4) The prosecutor committed misconduct by eliciting testimony that defendant's wife, Nancy Liu (Nancy),[2] had cancer.

We affirm.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

Defendant and Nancy married in 1988 and had three children. In 2005, Nancy told defendant that she wanted to separate. She agreed to stay with defendant in their

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  We refer to various related persons by their first names, not from disrespect, but to avoid confusion.

2

house in Perris for financial reasons and for the children, but she made preparations for divorce. Nancy and defendant both worked at Morongo Casino; they had different shifts and different times. At work, they shared a locker, in which they had to put all of their personal belongings while working.

In 2009, Nancy began dating Sandoval, who also worked at the casino. When they started dating, Sandoval was aware that she was living with her husband, but he understood that Nancy and defendant were separated. Nancy continued having sexual relations with defendant up until 2013 because she believed it was the only way to keep peace in her house. In January 2013, Nancy told defendant that she was dating Sandoval.

Two months later, Nancy filed for divorce[3] and moved in with a friend. During that time, she received several "terrifying" telephone calls from defendant. He often called 20 or 30 times a day. She did not report his threats to the police because they both would have lost their jobs. She explained that, in the gaming industry, any instance of harassment or domestic violence could cause a casino to terminate employment. Nancy spoke to her family and asked a friend who was a police officer to talk to defendant about his threats. Once, defendant called while he was outside her residence, even though she had never told him where she was living.

Nancy began to record defendant's telephone calls in late March or early April 2013. Two were played for the jury. One day, at around 4:00 a.m., defendant told Nancy that she was "never going to leave" him. When she replied that she was divorcing him, defendant said: "Let's see over my dead body honey. [¶] . . . [¶] I'm going to fucking hurt everybody." He later said, "I will follow you and I will get him, honey. . . . Good luck to him and good luck to his fucking family. . . . This is the fucking last warning for him. . . . I could have fucking hurt him today." That night, in another telephone call, defendant told Nancy that Sandoval had ruined his life and that he would ruin Sandoval's life. Defendant stated: "I am going to firkin' kill him yester—last night" and that Sandoval was "lucky last night." Defendant also told Nancy: "He will be dead. [¶] . . .

---

[3] The divorce became final in September 2013.

3

[¶] He is fucking my wife and I am going to kill him. I have all the fucking right to do that." He then told Nancy that he had parked in front of her house that day but did not do anything to her. She asked him about lock ties[4] that she had discovered under his pillow and he just replied "Okay."

A few months later, Nancy moved into an apartment in La Puente. She did not tell defendant where she was living because she feared for her life. When she got off work at 4:00 a.m., she drove around her neighborhood for a while to make sure that she was not being followed. No one other than Nancy had keys to her apartment; neither Sandoval nor defendant had ever stayed the night at her place.

Sometime before September, defendant called Sandoval and accused him of "'screwing [his] wife.'" Sandoval told defendant that he and Nancy were dating and that Nancy had said that there was nothing going on between her and defendant. Defendant became upset and angrily told Sandoval to stay away from Nancy. He threatened Sandoval if he did not stop contacting Nancy, saying: "'If I ever see you, I'll kill you.'" Sandoval was scared and told Nancy about the telephone call.

Sometime in late August, defendant called Nancy and told her that he was overwhelmed with a family issue. He said that he was "going to kill everybody" if she did not go back to his house in Perris and take care of it. Nancy went to the house and stayed for about four days. She and defendant did not have any reconciliation talks. At the time, Sandoval was in Mexico.

On September 6, 2013, Nancy and Sandoval returned to her apartment after going shopping. Sandoval put the items they had purchased on the bed and gave Nancy a hug. Defendant emerged from the bathroom and pointed a gun with a homemade silencer at them. He said, "'I going to kill you,'" several times. Sandoval believed that defendant was going to kill him, and he was scared for himself and Nancy.

---

**4**     Nancy acknowledged that she and defendant had used scarves as tie devices during sex, but she never saw plastic lock ties before finding them under defendant's pillow.

Defendant told Sandoval to sit, and he sat on the bed. Nancy was facing defendant and told Sandoval not to sit. Sandoval stood up. Defendant pointed the gun at Nancy and said, "'I told you both that if you made me crazy, this was going to happen. I'm going to kill you both.'" Nancy told defendant that she and defendant were not together and that Sandoval had nothing to do with their relationship. She begged him to stop and not hurt anyone. When defendant pointed the gun at Sandoval, Nancy moved in front of him. Defendant pushed her out of the way and Sandoval lunged at him. Sandoval grabbed defendant's right wrist with his left hand. The gun discharged and made a "pop" sound. Sandoval and defendant fell to the floor and the gun fell out of reach. When defendant reached for the gun, Sandoval pulled him away and held him down. They both fell back onto the bed. Nancy went outside and called 9-1-1.

Jacob Rico (Rico), Nancy's neighbor, saw Nancy yelling into a cell phone that "he has a gun." She pointed toward her apartment. Through the open door, Rico saw defendant and Sandoval struggling on a bed. Sandoval was holding defendant's arms and neck from behind. Rico ran into the room and helped restrain defendant until deputies arrived. Sandoval sustained minor injuries to his forehead from the struggle.

Deputies took defendant into custody. As he was being searched, defendant said, "'I was going to shoot that motherfucker because he was sleeping with my wife.'" Deputies found a loaded gun magazine and 69 rounds of nine-millimeter ammunition in his pockets. They also found on his person a key that matched Nancy's front door.

A loaded Smith and Wesson nine-millimeter handgun with a blue cylinder attached to the muzzle was on the bathroom floor, along with an expended shell casing. The handgun had an aftermarket threaded barrel that allowed for the blue silencer to be attached. The silencer had been made from an oil filter. Forensic analyst Amanda Davis examined the gun and found that it had functioning safety mechanisms and a trigger pull of five and three-quarters pounds. There was a bullet hole by the mirror in the bathroom. The nine-millimeter bullet was found in Rico's next-door apartment.

Deputies also found a black bag inside the apartment next to the bed. It contained plastic zip ties and a wire cutter. The zip ties were tied together to form two handcuffs

5

with another tie linking them together. The bag and its contents did not belong to Nancy. There were no signs of forced entry into the apartment.

A vehicle belonging to defendant was parked a few blocks away. A pink gym bag was in the trunk and contained two oil filter canisters, an empty box of ammunition, pliers, a wood stick, rope, packaging tape, and a red bag with washers and gloves. Nancy had previously left this gym bag at the Perris house, but none of the items in the bag belonged to her.

Defendant had purchased the gun on August 5, 2013, and picked it up nearly two weeks later. The gun store manager had showed him how to use it properly. Defendant took his son to a firing range in August. Defendant had previously been issued a handgun safety certificate card on June 20, 2013.

After defendant was arrested, Nancy removed a safe containing her jewelry from the Perris house.

II. *Defense Evidence*

Defendant testified that in January 2013, Nancy told him that she was having an affair. He was hurt, angry, and depressed. In March, she moved out of their Perris home and filed for divorce. In March or April, defendant made threats to hurt people, but he never acted on them. He admitted to making the threatening phone calls to Nancy and he wanted her to feel scared. He lied on the phone when he told her that he was outside her residence.

Defendant and Nancy had been having sexual relations until 2013. They sometimes used items such as scarves for tying, but they never used zip ties. Once, defendant tried to use a zip tie with Nancy, but she would not let him.

Defendant bought a handgun in August and sometimes went to a shooting range. He bought the silencer canisters online as aftermarket attachments. He used them on the gun because he sometimes went shooting in the desert. He learned online how to put the silencer together with various parts. He transported his gun and accessories in a Puma bag that he kept in his car trunk.

6

Defendant had been to Nancy's apartment in La Puente several times and spent one night there in August. Nancy gave him the key to the apartment; he denied taking it from their shared locker at the casino. On August 21, 2013, he brought a black bag and left it at her apartment. The bag contained zip ties and ropes that they had used during sex.

The last time defendant went shooting in the desert, he removed his gun from the trunk and brought it into the house. He did not know how the bag was placed back in the trunk on September 6, 2013. During the week that Nancy was at his house in August, she drove his car. On September 5, 2013, defendant learned that Nancy had taken a safe from the house. His gun and ammunition, which were in a locked case, were also missing. He called Nancy and she admitted that she had taken the items.

On September 6, 2013, at around 2:30 p.m., defendant parked his car behind Nancy's apartment. He went inside and searched for his items. He found the black bag, containing his gun, ammunition, and attachments, in the bathroom. He put the magazine in the gun and attached the silencer in order to make sure that everything worked. He put the ammunition in his pocket and walked out of the bathroom. Defendant was surprised when Nancy and Sandoval entered the apartment. He held the gun pointed at the floor. This was the first time that he had ever seen Sandoval and he was angry. But he did not threaten to shoot or point the gun at anyone. When he entered the apartment, he did not know that anyone would be there and he had no intent to hurt or kill anyone.

Nancy stood in front of Sandoval. Sandoval asked defendant what he was doing there, and defendant asked Sandoval what he was doing with his wife. Defendant asked Nancy why Sandoval was still with her and said that they needed to sit and talk. Sandoval approached, and defendant said: "'I got a gun. I'm going to shoot you, you motherfucker.'" Nancy told defendant that they were not going to talk that day and that he was not going to shoot anyone. She reached for his gun, and defendant pushed her hand away. Sandoval charged him, slapped his hand, and grabbed for the gun. They fell and struggled on the floor. Sandoval picked him up and threw him on the bed. Defendant did not shoot the gun.

7

Defendant denied making any statement to the police while he was arrested.

Tiffany Liu (Tiffany), defendant and Nancy's daughter, testified that defendant told her sometime in 2013 that Nancy was dating Sandoval. When Nancy moved out of their house in March, defendant was upset and angry. He said that he wanted to hurt Sandoval. In late August, Nancy stayed at their house for a few days. Nancy told Tiffany that she was confused and wanted to keep her family together. Around that time, Nancy told Tiffany that defendant was with her at the apartment. Nancy told Tiffany that she was afraid of defendant but believed that he would never hurt her.

Nancy further told Tiffany that on September 6, 2013, she and Sandoval entered her apartment. Defendant was coming out of the bathroom and they argued. He said that she destroyed his life. Defendant was waving a gun but not pointing it at anyone. Nancy stood between defendant and Sandoval. When defendant moved her to the side, Sandoval rushed toward him and they fell to the floor. Sandoval grabbed defendant's hand and the gun went off during the struggle.

Sam Liu (Sam), defendant and Nancy's son, testified that Nancy had told him that when she and Sandoval arrived at her apartment, defendant was inside with a gun. She stepped in front of Sandoval and told defendant that if he was going to shoot anyone, he should shoot her. Sandoval and defendant struggled for the gun and a shot accidentally fired. Earlier, defendant had taken Sam to a shooting range for practice shooting.

Phillip Liu (Phillip), defendant's brother, testified that Nancy had called him after the incident. She said that defendant was in her apartment with a gun when she and Sandoval arrived. She distracted him and Sandoval grabbed the gun. The gun fell to the floor and accidentally fired. Phillip testified that Nancy had told him that defendant regularly visited her at the apartment and stayed the night. Sometimes, he brought a gun because he was concerned that she was living alone.

Stephen Seger (Seger), a family friend, testified that Nancy had discussed the incident with him by telephone. She said that she stood in front of Sandoval and told defendant that if he was going to hurt anyone, he should hurt her. Sandoval then pushed

8

Nancy away and attacked defendant. Defendant and Sandoval fell to the floor and the gun accidentally discharged.

John H. Pride (Pride), a firearms expert, examined defendant's handgun. He found that the trigger pressure was within the acceptable range for this firearm. The blue cylinder was a silencer that was illegal to own in California. Pride explained that there were situations where the gun could be fired accidentally, such as during a struggle. Where someone grabs the wrist of a person holding a gun, it might cause the person to accidentally pull the trigger. The firearm evidence was consistent with both an intentional and unintentional firing. The silencer attachment might explain why there was not a round in the chamber when the gun was fired.

III. *Prosecution Rebuttal Evidence*

Thuy Lien Nguyen Gomez (Gomez), who had been dating Sam, lived at defendant's house for a time. Defendant found out about Nancy's relationship with Sandoval in January after going through Nancy's cell phone. He said that if Nancy was still seeing Sandoval, he was "dead to him." In June 2013, defendant showed Gomez a photograph of Sandoval and asked her if it was him; she said yes. Once, Nancy asked her to stay outside the bedroom while she and defendant argued because she was concerned that he might do something. Nancy told Gomez that she still had sex with defendant to "keep peace."

Nancy told Gomez that on September 6, 2013, defendant exited the bathroom with a gun and waved it around, and said that Sandoval had ruined his life. Defendant pushed Nancy away and Sandoval rushed defendant to get the gun. As they struggled, the gun fired.

## DISCUSSION

I. *The trial court properly did not instruct the jury on voluntary manslaughter*

Defendant argues that the trial court erred when it refused a heat of passion instruction.

A.  Relevant Proceedings

During trial, the defense indicated that it would request that the trial court instruct the jury on the lesser included offense of attempted voluntary manslaughter.  The trial court stated that it would so instruct if substantial evidence of heat of passion or sudden quarrel was presented at trial.

After defendant testified, the trial court indicated that there was no evidence of any lesser included offense to the attempted murder charges in counts 1 and 2.  The trial court noted that defendant presented an absolute defense, namely that he never pointed the gun at anyone and that it discharged accidentally.  Because there was no intent to kill inferable from the defense evidence, there could be no attempted voluntary manslaughter offense, since that offense requires an intent to kill.  Accordingly, the trial court denied defendant's request for an instruction on attempted voluntary manslaughter.

B.  Analysis

Courts have a sua sponte duty to instruct on lesser included offenses when the offense is supported by substantial evidence, which, if accepted, would permit the jury to find the defendant not guilty of the greater offense and guilty of the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.)  A trial court need not instruct the jury on a lesser included offense where no evidence supports a finding that the offense was anything less than the crime charged. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.)

Voluntary manslaughter is a lesser included offense of murder when the requisite mental element of malice is negated by a sudden quarrel or heat of passion or by an unreasonable but good faith belief in the necessity of self-defense. (*People v. Elmore* (2014) 59 Cal.4th 121, 133; see also § 192.)  Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 255–256.)

Here, the prosecution presented evidence of attempted murder—defendant was angry and upset when he learned of Nancy's affair with Sandoval; defendant threatened to kill Sandoval and others; defendant had purchased a handgun one month before the

instant shooting; defendant modified that handgun illegally with a homemade silencer; defendant entered Nancy's apartment without permission, pointed the gun at Nancy and Sandoval, and discharged the gun during a struggle. There was no evidence of sufficient provocation resulting from a sudden quarrel or heat of passion.

Defendant claims that he "acted under the influence of a stirring passion, the humiliation and distress of seeing his wife's lover for the first time, not only face to face, but embracing her in the small studio apartment near her bed." But there is no evidence that the confrontation and the embrace led to a heat of passion that negated his intent to kill. He had known for at least eight months that Nancy was seeing someone else. She had filed for divorce in March and it was set to become final on September 14, 2013. And, he had seen a photograph of Sandoval three months before the shooting. Taken together, this evidence confirms that defendant's anger and emotions that drove his actions emerged long before the shooting; they did not arise out of a sudden quarrel or heat of passion.

Defendant's testimony also did not support an instruction on attempted voluntary manslaughter. Rather, as the trial court noted, his testimony supported a complete defense to the attempted murder charges.

Defendant's reliance upon *People v. Millbrook* (2014) 222 Cal.App.4th 1122 (*Millbrook*) and *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*) is misplaced. In *Millbrook*, there was evidence that the defendant was acting under the actual influence of extreme emotion. (*Millbrook*, *supra*, at pp. 1139–1140.) Likewise, in *Thomas*, the defendant shot the victim; at trial, he testified that he pulled the trigger out of fear and nervousness. (*Thomas*, *supra*, at p. 645.) In contrast, here there is no evidence that defendant acted under a heat of passion or other emotion. Rather, defendant's contention at trial was that the gun discharged accidentally.

It follows that the trial court did not err in refusing to give an attempted voluntary manslaughter instruction and that defendant was not deprived of his due process rights.

11

II. *The trial court properly excluded psychiatric expert testimony as to defendant's mental state*

Defendant argues that the trial court erred when it excluded the defense psychiatric expert to testify about his mental condition.

A. Relevant Proceedings

Before trial, the prosecutor moved to exclude the proffered testimony of Dr. Ronald Markman regarding defendant's mental state and how people typically react to certain provocation. Later, defense counsel made an offer of proof. According to Dr. Markman: "The behavior that led to [defendant's] arrest was clearly the result of an overwhelming sense of being rejected by his wife, which likely initiated feelings of inadequacy and worthlessness. This emotional instability also unleashed an uncontrollable anger potential that resulted in a lack of judgment, thoughtlessness and impulsive behavior controlled by emotions, consistent with an event occurring in the heat of passion." Relying upon *People v. Czahara* (1988) 203 Cal.App.3d 1468 (*Czahara*), the trial court precluded Dr. Markman from testifying.

B. Analysis

An expert witness may offer opinion testimony if the subject is sufficiently beyond common experience that it would assist the trier of fact. (Evid. Code, § 801.) A trial court has broad discretion to determine the admissibility of expert testimony, and its ruling is reviewed for an abuse of that discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Here, the trial court did not err in excluding Dr. Markman's testimony. As set forth above, there is no evidence that defendant committed the instant offenses under a heat of passion or sudden quarrel. In fact, defendant testified that the shooting was accidental. Thus, Dr. Markman's testimony would have been irrelevant to the jury's determination of whether defendant had the intent to kill when he shot at Sandoval.

Defendant claims that the expert testimony would have been relevant to show that he was under a tremendous amount of stress from the affair and divorce. But this type of

12

evidence does not require expert testimony; the emotional effects of divorce are within the common experience of jurors. (*Czahara*, *supra*, 203 Cal.App.3d at p. 1478.)

Moreover, defendant was not denied the opportunity to present a defense. He was fully allowed to, and did, present a defense of accident and lack of intent to kill. Thus, defendant's constitutional contention is meritless.

III. *The trial court properly excluded evidence of defendant's allegation that Sandoval molested his daughter*

Defendant argues that the trial court improperly excluded testimony that Sandoval was accused of molesting defendant's daughter Jasmine.

A. Relevant Proceedings

During cross-examination, defense counsel asked Sandoval if he was aware that there was an allegation against him concerning Jasmine, defendant's daughter. Following the prosecutor's objection, defense counsel contended that there were allegations against Sandoval for "potential[]" molestation during defendant and Nancy's divorce proceedings. Therefore, this questioning was relevant to Sandoval's mental state, motive, and credibility. After all, Sandoval might have been angry because of the accusation and reacted upon seeing defendant in the apartment. The trial court allowed defense counsel to ask Sandoval if there were any arguments between him and defendant in any capacity. But the trial court precluded the defense attorney from specifically asking about any molestation allegation, pursuant to Evidence Code section 352.

B. Analysis

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference" to establish disputed material facts such as identity, intent, or motive. [Citation.]'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.)

The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence. (*People v. Carter*, *supra*, 36 Cal.4th at

pp. 1166–1167.) A trial court's exercise of discretion in excluding evidence is reviewed for abuse of discretion, and "the [trial] court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

Here, the evidence concerning the accusation was irrelevant to the issues at trial. Whether there was an accusation against Sandoval concerning defendant's daughter had no relevance to defendant's actions during the incident. Sandoval testified that there was no argument between the parties other than that concerning defendant pointing a gun at them and saying that he was going to shoot Sandoval for dating Nancy. Moreover, defendant did not testify that he was motivated by any molestation accusation against Sandoval; rather, he testified that his presence in the apartment with Nancy and Sandoval and the discharge of the gun were accidental and not driven by emotion. While defendant testified that he was hurt and angry, those emotions were directed at Nancy and Sandoval for their affair, not the result of any unsubstantiated allegation of molestation.

Moreover, there was no credible evidence of any molestation accusation. Defense counsel's theory was based upon a therapist's letter, which the trial court noted had nothing to do with molestation; "[t]hat was counsel's surmising. . . . [¶] . . . ¶] It was counsel's fertile imagination that it was somehow related to molestation, but there was nothing explicit."

Under these circumstances, allowing defense counsel's question about a molestation accusation would have been far more prejudicial than probative. (Evid. Code, § 352.) It follows that the trial court did not abuse its discretion in excluding it.

IV. *The prosecutor did not err by eliciting testimony that Nancy had cancer*

Defendant contends that the prosecutor committed misconduct when he elicited testimony that Nancy had cancer.

A. Relevant Proceedings

On direct examination, the prosecutor began by asking Nancy if she was currently undergoing treatment for cancer. Following a defense objection on the grounds of

14

relevance, the prosecutor explained that her treatment was relevant to her mental state "in regards to testifying." The trial court overruled the objection and asked Nancy if she was taking any medication as a result of her treatment. She answered affirmatively and stated that she would do her best to think and answer questions.

During a recess, the trial court noted to the prosecutor that "the proper way to introduce a witness who may be under medication is to simply ask, are you currently taking medication? Yes. If so, does that have an effect on what she is saying here today. If she says yes, what type of effects does it have on you. You don't have to get into why she was taking medication or anything else to appeal to the sympathy of the jury, in terms of this particular witness. [¶] The court has already admonished this jury during the jury selection that—repeatedly, that whatever empathy or sympathy they have with the witness, it's going to be an evidence-based decision and evidence-based decision only. You know better than that. There's a way to approach that subject without getting into the issue of why she's taking medication or even identifying the medication . . . ." The trial court further advised that if medication causes a witness to get tired and need breaks or need an opportunity to refresh himself or herself, then the trial court would accommodate.

Defense counsel then moved for a mistrial: "To be honest, I don't think anything can be more prejudicial and have passion or sympathy for a jury. I understand the court painstakingly tried, at least for the defense, to say it's an emotionless based decision, and then we have this. You can't unring that bell. [¶] And my dad died of cancer, so I can't believe it was asked, but I wanted to throw that in, too."

Noting that the jury was an intelligent jury, the trial court denied the motion.

When Nancy resumed her testimony, she stated that she moved to that particular apartment because it was closer to the medical office for her chemotherapy and radiation treatments.

After Nancy finished her testimony, the trial court instructed the jurors: "At the outset of witness's testimony, it was mentioned of her medical condition, and the fact that she's taking medication. That is only relevant in terms of whether she is competent to

15

testify and whether the medication affects her stamina or ability to testify. But as I told you at the outset of this trial during jury selection, this decision will be made based upon the evidence. It's not going to be an emotional-based [decision]. It's not going to be a[n] empathy-based decision or sympathy-based decision."

Nancy returned to testify the following day. She stated that on the morning of the shooting, she had a biopsy done at a laboratory. She also said that she told her children in 2014 that her cancer was in remission, but she was actually still undergoing treatment; she only told her children that the cancer was in remission so they would not be concerned.

B. Forfeiture

Generally, a defendant forfeits a claim of prosecutorial misconduct unless the defendant makes a specific objection to the argument in the trial court and requests that the jury be admonished to disregard it. (*People v. Jackson* (2014) 58 Cal.4th 724, 762; see also *People v. Reyes* (2016) 246 Cal.App.4th 62, 76–77.) "Counsel has an obligation to state the '*specific ground* for an objection in order to preserve the issue for appeal.' [Citations.]" (*Id.* at p. 77.)

Here, defense counsel preserved defendant's claim of evidentiary error as to the admission of Nancy's medical condition, but he failed to object to the prosecutor's question as misconduct. Accordingly, he has forfeited his prosecutorial misconduct claim. (*People v. Reyes*, *supra*, 246 Cal.App.4th at p. 77 ["Counsel forfeited any claim of prosecutorial misconduct in connection with these remarks by failing to assign misconduct to the prosecutor's statements"].)

16

C. <u>Analysis</u>

Even reaching the merits of defendant's contention, it fails. A prosecutor's conduct violates the Fourteenth Amendment to the United States Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Reyes*, *supra*, 246 Cal.App.4th at p. 71.) That did not occur here. Nancy's condition and medication were relevant to her competence and ability to testify. It follows that the prosecutor's questions did not amount to misconduct.

Even if the prosecutor did err in asking Nancy about her medical condition, and even if that issue were preserved for appeal, defendant has not shown that there was a reasonable probability that the jury's verdict would have been different. (*People v. Frye* (1998) 18 Cal.4th 894, 976, overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The trial court repeatedly told the jurors that they were to decide the case based on the evidence, not on emotions. We presume that the jurors understood and followed the trial court's instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) Moreover, the fact of Nancy's cancer was admitted through her subsequent testimony. Thus, the jury would have learned about it anyway. Last, as set forth above, the evidence that defendant committed attempted murder was strong.

IV. *Cumulative effect of alleged errors*

Finally, defendant argues that the cumulative effect of the trial court's errors violated defendant's right to due process. As set forth above, we find no error. It follows that there was no cumulative prejudicial effect of any error on defendant's right to due process.

17

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

18